KENTUCKY BLOCK CANNEL COAL CO. v. NANCE.

(Circuit Court of Appeals, Sixth Circuit. November 20, 1908.)

No. 1,803.

1. MASTER AND SERVANT (§ 101*) — MASTER'S LIABILITY FOR INJURIES TO SERVANT—SAFE PLACE TO WORK.

The duty of a master to provide a reasonably safe place for employés to work, having regard to the kind of work, is a continuing one, and includes the maintenance of the place in such reasonably safe condition, although such duty of maintenance is not so absolute as to charge the master with liability for injuries to servants resulting from the place becoming unsafe through the work there carried on.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 171; Dec. Dig. § 101.*]

2. MASTER AND SERVANT (§ 190*)—MASTER'S LIABILITY FOR INJURIES TO SERVANT—SAFE PLACE TO WORK.

Plaintiff was employed in mining coal in an entry in defendant's mine. Along the entry, about six feet from the floor, ran a drain pipe supported on wooden props. The mine boss directed an employé to disconnect and remove such pipe, first notifying the men at work in the entry. He neglected to notify plaintiff, however, and in the first place negligently disconnected the pipe from the pump on the outside, leaving both ends unsupported, when the whole line fell over and struck and injured plaintiff. *Held*, that the employé engaged in removing the pipe was not a fellow servant of plaintiff in the mining operations, but was performing a work

of construction or alteration, and his duty of exercising care to maintain the place where the miners were working in a reasonably safe condition while doing such work, and to warn them of the danger therefrom, were duties of the master, which was responsible for their nonperformance.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 449; Dec. Dig. § 190.*]

In Error to the Circuit Court of the United States for the Eastern District of Kentucky.

Action in tort. Thomas Nance, the plaintiff below, while mining coal in the service of the plaintiff in error, was injured by the sudden and unexpected falling of a long line of drainage pipe which was carried on a line of wooden props at the top of the main entry over the place where he was mining. The inner end of this line of pipe lay on the floor of a dip or sag in the floor of the entry in which water collected. From that point it inclined upwards, and was carried on the top of a line of wooden props, some six feet high and about six feet apart, to a point outside the mouth of the entry. There this outer and elevated end was securely attached to a stationary pump by means of which water was drawn from the mine. The pipe was in sections a few feet in length, being coupled together by threaded screws. This pipe had been in place about three months, and had stood safely enough until the accident to Nance. The particular entry in which it had been used for drainage had been about worked out, and the coal in the "stumps" or "pillars" supporting the roof of the mine were being robbed, and Nance was so engaged when hurt.

On the morning of Nance's injury, Henry Vaughn, the mine boss, directed Jasper Belcher, who had charge of the work of putting in and taking out both compressed air and drainage piping, to disconnect and remove this pipe. Belcher, upon this point, testified that Vaughn, the mine boss, "met me on the outside and told me to go in and remove the pipe, disconnect the pipe and pump. He wanted it for another place. He said, 'Now, Jasper, go in there and notify those boys that you are going to remove this pipe.'" Belcher went into the entry, saw Nance moving one of the heavy cutting machines, and himself assisted, as he says, in "cutting a few licks." Unfortunately he forgot to warn Nance of what he was going to do, though he left him at his work under the pipe with the observation that he "must get to work or the captain (meaning Vaughn, the mine boss) will get after me." Thereupon he went outside the entry and detached the pipe connection at the pump. The witness then says:

"I uncoupled the pipe, and about that time a dread kind of struck me that it might give way; I held to this end and laid it down on the bottom careful. I stayed then to see if it was going to give way, so I could give notice, but it didn't seem to be going to give way, and I turned around and went to work, and it all came down sudden."

These are the only essential facts of the case. The court denied a request for a peremptory instruction for the coal company, and submitted the case to the jury upon the single proposition that, if the jury should find that Nance was not notified of Belcher's purpose to remove this pipe, they should find for him such damage as would compensate him.

There was a judgment for Nance, and the coal company has sued out this writ of error.

John Hagar, for plaintiff in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). That it was the general duty of the coal company to provide a reasonably safe place, having regard to the kind of work involved, in which Nance

and his fellows could carry on the work for which they were employed, is incontestable. That it is also the duty of the master to keep the place reasonably safe is equally clear, for the duty of furnishing a safe place to work is a continuing duty. Santa Fé Railroad v. Holmes, 202 U. S. 438, 26 Sup. Ct. 676, 50 L. Ed. 1094.

Manifestly, this duty of providing a safe place is dependent upon the character of the work to be done there. Hence, when that work is one of construction, reconstruction, destruction, or repair, the risks which are incident to such places and kinds of work are assumed by the servants there employed. Chesapeake & Ohio R. Co. v. Hennessey, 96 Fed. 713, 38 C. C. A. 307, 314; American Bridge Co. v. Seeds, 144 Fed. 605, 75 C. C. A. 407, 11 L. R. A. (N. S.) 1041; Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433, 28 L. Ed. 440. Neither is the duty of maintaining a safe place so absolute as to charge the master with injuries to servants resulting from the place becoming unsafe through the negligent performance of the work there to be done. Deye v. Lodge & Shipley Mach. Tool Co., 137 Fed. 480, 70 C. C. A. 64; American Bridge Co. v. Seeds, 144 Fed. 605, 613, 75 C. C. A. 407, 11 L. R. A. (N. S.) 1041; Baird v. Reilly, 92 Fed. 884, 35 C. C. A. 78; Perry v. Rogers, 157 N. Y. 251, 51 N. E. 1021.

The entry in which Nance was working was safe enough before Belcher uncoupled the attachment of this elevated line of pipe to the stationary pump outside. It then became an unsafe and dangerous place for one working under or near this line of pipe. Belcher's alarm that the uncoupling of the attached outer section would leave both ends "in the air" and cause a strain upon the line of insecure props likely to topple them over with disastrous results to miners working under or near them was not groundless. This danger was plain to anybody; Vaughn, the mine boss, knew it. Hence his direction that "the boys" should be warned to look out. Belcher, we have seen, realized it, and then foolishly recovered from his alarm and went on with the work. To say that such a structure could not be taken down without danger, if true, is inconsequential, for in such case it was negligent to take it down at all without full warning; if its fall was likely to injure employés engaged in work so near as to be hurt if it should fall. But it cannot be said that there was no safe way to remove it. If the work of uncoupling had been begun at the unsupported end in the entry, there would have been no danger, for the uncoupling of section after section from that end would leave the standing sections as secure as before. Adopting a dangerous method of removing this fixture, it was plainly incumbent upon somebody that Nance and his fellows, whose place of work was thereby made dangerous, should be warned, that they might either refuse to work in so dangerous a place while the removal was going on or assume the risk of the new danger, relying upon watchfulness to escape in case the props should begin to fall. In the latter case the effect of notice would have been to put Nance to an election as to whether he would take the risk or quit. But he was given no election, nor did he have any reason to suspect this danger, and that a safe place was to be converted into a dangerous place by this change in the security of this line of pipe. But it is said that the failure to give warning was the fault of

Belcher, and that Belcher was the fellow servant of Nance. There are a line of cases in which it is held that, where the master has provided competent co-servants, exercised due care in providing a reasonably safe place to work and safe appliances, and, where the work is complicated, provided suitable rules and regulations for the general operation of the plant or machines, the duty of 'warning against perils incident to the operation of the plant, or conduct or character of the work being carried on, is not one of those personal duties of the master which may not be delegated. Where the master has exercised reasonable care in respect to the matters referred to, the supervision, control, and management of the details may be left to the judgment and discretion of those superior servants who are intrusted with the management. The general rule is illustrated and stated in many cases by the Supreme Court and this court. Some of the cases we cite: Central Railroad Co. v. Keegan, 160 U. S. 259, 267, 16 Sup. Ct. 269, 40 L. Ed. 418; Northern Pacific Railroad Co. v. Dixon, 194 U. S. 338, 24 Sup. Ct. 683, 48 L. Ed. 1006; Martin v. Atchison, Topeka & Santa Fé Ry. Co., 166 U. S. 399, 463, 17 Sup. Ct. 603, 41 L. Ed. 1051; Grady v. Southern Railway Co., 92 Fed. 491, 34 C. C. A. 494; Deye v. Lodge & Shipley Mach. Tool Co., 137 Fed. 480, 70 C. C. A. 64; Penn. Railroad Co. v. Fishack, 123 Fed. 465, 59 C. C. A. 269; Kinnear Mfg. Co. v. Carlisle, 152 Fed. 933, 82 C. C. A. 81.

But the principle appealed to has no proper application here. The removal of the drainage pipe was, in no legitimate sense, one of the details or incidents of the work of operating the mine, regarding it, for the purpose, as a unitary plant or great machine. The drainage pipe was a fixture, an appliance essential to the proper drainage of the mine. If it had fallen because proper care had not been used in its construction or maintenance, and injured servants whose duties called them to pass or work under or near it, there could be no doubt of the master's liability, for it was a part of the place where they were to work. By the direction of the master, acting by the mine boss, the section outside is uncoupled for the purpose of removing the pipe in sections, and the whole structure comes tumbling down upon the heads of men having nothing to do with the construction, removal, or maintenance of the pipe and no knowledge of what was going on. Upon what principle can we distinguish between liability with or without the active intervention of the master in producing the catastrophe? The duty of exercising due care in taking this structure down, so as not to injure men working under it, was just as much a personal, nondelegable duty of the master as the original duty of care of construction and maintenance. Belcher's work was not a work of operation; Nance's work was. Nance was not engaged with Belcher in his work of construction or demolition. If he had been, as respects that work, he would have been his fellow servant. A factory chimney is built so carelessly that it falls and injures men at work in the factory. Or such a chimney is being taken down by servants of the master, and it falls, because of their lack of due care, upon the other servants at work in the factory. The cases are parallel in principle. In both illustrations the work is the personal work of the master, for in neither instance was it a work of operation. The case, upon its facts, is nearer

to Northwestern Fuel Co. v. Danielson, 57 Fed. 915, 6 C. C. A. 636 (C. C. A., 8th Circuit, opinion by Sanborn, Circuit Judge). Certain men were employed to shovel coal from a pier into a train alongside a coal track. Above them was a trestle work which was being taken down by another gang of men. Through the want of due care by the men engaged in removing the trestle work, a bent fell and injured one of the gang of coal shovelers below. There was a judgment against the common master. The judgment was affirmed both upon the ground that the men taking down the bents of the trestle were doing the personal work of the master in discharge of the duty of using due care to keep safe the place where the work of the coal shovelers was being done, as well as upon the ground that the latter were ignorant that the work was going on and had not, therefore, assumed the new risk incident thereto.

Judgment affirmed.